**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CLAUDE J. CLARK | : | |
| | : | |
| v. | : | Civ. No. 06-4497 |
| | : | |
| SOUTHEASTERN PENNSYLVANIA | : | |
| TRANSPORTATION AUTHORITY | : | |

---

Diamond, J.                                                                         January 24, 2008

# M E M O R A N D U M

Plaintiff Claude J. Clark alleges that his current employer, Defendant Southeastern Pennsylvania Transportation Authority, has violated the Americans with Disabilities Act of 1990, the Rehabilitation Act, and the Pennsylvania Human Relations Act. 42 U.S.C. § 12101 et seq., 29 U.S.C. § 701 et seq., 43 Pa. Stat. Ann. § 955 et seq. The Parties have filed cross Motions for Summary Judgment. I deny Plaintiff's Motion and grant Defendant's Motion.

## I.      LEGAL STANDARDS

Upon motion of any party, summary judgment is appropriate

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). Summary judgment may be granted only if the movant shows that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it could affect the result of the

1

suit under governing law.  Id.

In deciding whether to grant summary judgment, the district court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh v. Butler County Family YMCA, 418 F.3d 265 (3d Cir. 2005).  If, after viewing all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  See Celotex, 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The opposing party must support each essential element with concrete evidence in the record.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."  Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (restating Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

On cross motions for summary judgment, the same standard and burdens apply.  See Applemans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987); Peters Township School District v. Hartford Accident and Indemnity Co., 833 F.2d 32, 34 (3d Cir. 1987).  Cross motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (quoting

Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  Further, when presented with cross motions for summary judgment, the Court must consider the motions separately.  See Williams v. Philadelphia Hous. Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd mem., 27 F.3d 560 (3d Cir. 1994).

## II.   BACKGROUND

In describing the background of this case, I have set out those record facts that are undisputed, and construed them in the light most favorable to Plaintiff.  I have disregarded those factual allegations that Plaintiff makes without any evidentiary support.  See Celotex, 477 U.S. at 322-23;  Jones v. United Parcel Service, 214 F.3d 402, 407 (3d Cir. 2000) (requiring more than "unsupported allegations" to defeat summary judgment).  I have separately noted those instances where Plaintiff disputes factual contentions made by Defendant, but provides no evidentiary basis for these purported disputes.  I have treated these factual contentions as undisputed.  See Blaylock v. City of Phila., 504 F.3d 405, 413 (3d Cir.  2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)) (when the record contradicts a party's description of the facts, it does not create a genuine dispute).  I have accepted as true all other factual contentions made by Plaintiff and construed them in the light most favorable to him.

### Plaintiff's Employment with SEPTA

The Commonwealth of Pennsylvania established SEPTA in 1964 to provide public transit services for Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties.  74 Pa. Cons. Stat. § 1711 (2007).

On January 3, 1994, SEPTA hired Plaintiff as a Vehicle & Equipment Mechanic 3rd Class. (Compl. at 2.)  Some time later, Plaintiff transferred to the position of Vehicle & Equipment Body

3

Mechanic 1st Class.  (Id.)

The primary responsibilities of a Body Mechanic include: (1) inspecting and assessing collision damage and estimating scope of necessary repair work; (2) repairing vehicles and equipment, including the removal and installation of interior and exterior body components; (3) making collision repairs; (4) cleaning, filing, sanding, and priming parts and painting body surfaces; (5) removing and replacing electrical and pneumatic parts, shafts, rollers, and tracks, and rehanging doors and posts; (6) chipping, scraping, and grinding rust from structural steel framework; (7) cutting, fabricating, and replacing structural components; and (8) using all types of welding, cutting, and joining equipment.  (Body Mechanic Job Posting, Doc. No. 20 Ex. C.)  The position requires employees to work at unprotected heights.  (4/23/07 Brennan Dep. at 28.)  Body Mechanics must also drive buses, and so must have a valid Commercial Driving License.  (4/12/07 Clark Dep. at 133-34; No. 41 Ex. A.)

SEPTA has designated the Body Mechanic a "safety sensitive" position.  (4/23/07 Brennan Dep. at 15, 28; 4/23/07 Press Dep. at 20; Doc. No. 51 at 4.)  Safety sensitive positions at SEPTA include those positions that require the operation of a SEPTA vehicle, working with power tools, working with machinery, working at heights, or working with hazardous materials.  (4/23/07 Press Dep. at 20.)

**Plaintiff's Brain Seizure Disorder**

Beginning on August 25, 1999, Plaintiff went on medical leave because he was injured in a car accident.  (Doc. No. 20 Ex. G; 4/12/07 Clark Dep at 56, 107.)  In April 2000, while still on medical leave, Plaintiff suffered three brain seizures. (Doc. No. 20 Ex. K.)  Plaintiff was admitted to the hospital and placed on Dilantin, an anti-seizure medication.  (Id.)  SEPTA terminated

4

Plaintiff's employment on May 9, 2000, after his sick time expired and, pursuant to the provisions of the Collective Bargaining Agreement with the Transport Workers Union, placed him on its "priority recall list." (Doc. No. 20 Ex. H, Ex. I.)  SEPTA may rehire an employee on the priority recall list to his former position, if he is medically capable of performing the job, or to an alternate position, if he is eligible. (Doc. No. 20 Ex. J.)  Once rehired, an employee will not be eligible to return to the priority recall list. (Id.)  Unaware of Plaintiff's seizures, on July 10, 2000, SEPTA reinstated Plaintiff to his former Body Mechanic position from the priority recall list. (Doc. No. 20 Ex. L.)

On November 5, 2003, Plaintiff again took medical leave.  In December 2003, while still on medical leave, Plaintiff suffered two brain seizures. (Doc. No. 20 Ex. P, Ex. R.)  He was again hospitalized twice and referred to a neurologist and a rehabilitation clinic. (Doc. No. 20 Ex. Q; Ex. R; Ex. S.)  On January 23, 2004, SEPTA terminated Plaintiff's employment after he used up all his allotted sick time. (Doc. No. 20 Ex. M.)

In April 2004, New Jersey, where Plaintiff resides, suspended both Plaintiff's driving license and commercial driving license because he was subject to brain seizures and so was medically and physically unable to operate a motor vehicle safely. (Doc. No. 20 Ex. X.)

**The Grievance Procedure and Settlements**

After Plaintiff's January 2004 termination, he and the TWU filed a contract grievance, alleging that his termination was improper under the CBA. (Doc. No. 20 Ex. Y.)  On May 27, 2004, SEPTA denied the grievance, concluding that it had properly terminated Plaintiff. (Id.)  On August 9, 2004, SEPTA, the TWU, and Plaintiff agreed to a settlement: (a) Plaintiff was to report to SEPTA's Medical Department for a reinstatement examination; and (b) upon clearance by the

Medical Department, Plaintiff was to be reinstated to employment. (Doc. No. 20 Ex. Z.)

On August 11, 2004, Dr. Kathie Gares, Chief Physician of SEPTA's Medical Department, examined Plaintiff.  (Doc. No. 20 Ex. AA, Ex. BB.)  During the examination, Plaintiff stated that he suffered from a seizure disorder and that he was taking an anti-seizure medication.  (Doc. No. 20 Ex. BB.)  Because Plaintiff did not provide Dr. Gares with his medical records, she did not know the cause of the seizure condition.  (Press Dep. at 38-39; 4/12/07 Clark Dep. at 171-72.)

Dr. Gares examined Plaintiff in accordance with the United States Department of Transportation's medical examination report.  (Doc. No. 20 Ex. AA, Ex. BB, Ex. E at 30-32.)  Under the DOT's medical guidelines, an individual who suffers from a condition that is likely to cause loss of consciousness, is taking anti-seizure medication, or has not fully recovered from a known medical condition that caused a seizure shall not drive a commercial motor vehicle.  (Doc. No. 20 Ex. BB.)  Accordingly, SEPTA cleared Plaintiff to return to work with a permanent medical restriction against driving any SEPTA vehicle.  Given this restriction, on August 20, 2004, SEPTA, the Union, and Plaintiff entered into a second settlement agreement, which provided as follows:

> (1) In accordance with a prior understanding between the parties, Mr. Clark was to be reinstated to the roles of the Authority....  However, on Wednesday, August 11, 2004 Septa's Medical Department approved Mr. Clark to return to work with a permanent medical restriction of no driving.
> (2) Therefore, in accordance with this settlement, Mr. Clark will be reinstated to the roles of the Authority as a Maintenance Custodian. ...
> (3) Mr. Clark's rate of pay will be commensurate with that of a Maintenance Custodian.  He is required to perform all of the job duties of a Maintenance Custodian.
> (4) Mr. Clark will receive no back pay from the time of his discharge until his reinstatement and the intervening time will be considered an absence without pay.
> (5) Mr. Clark understands he has exceeded his allotted sick leave by 29 days and has no sick leave remaining.  He understands he will not accrue sick leave until March 5, 2005.  Any sick turn-in between his reinstatement and March 5, 2005 will result in him being dropped from the roles of the Authority.

> This settlement resolves all of the outstanding issues surrounding the discharge of
> Claude Clark.  It is final and binding.

(Doc. No. 20 Ex. CC.)

Pursuant to that agreement, on August 23, 2004, SEPTA reinstated Plaintiff to the

Maintenance Custodian position.  (Doc. No. 20 Ex. DD.)  Helen Hill, who is not a SEPTA employee,

supervises Plaintiff.   (4/23/07 Hill Dep. at 8, 11.)  Maintenance Custodians are responsible for:

cleaning SEPTA facilities, locations, bus loops, and equipment; reporting problems and deficiencies

associated with daily routine; sweeping, cleaning, and washing surface building locations; removing

dirt and graffiti at loop facilities; and loading trash and scrap onto trucks for removal and disposal.

(Doc. No. 20 Ex. EE.)

When Plaintiff began as a Maintenance Custodian in August, 2004, SEPTA assigned him in

accordance with the system of placing employees in available jobs.  (4/12/07 Clark Dep.  at 200;

4/23/07 Hill Dep. at 31.)  The job available at the time was cleaning the restrooms at SEPTA's

offices on 1234 Market Street.  (4/12/07 Clark Dep. at 200; 4/23/07 Hill Dep. at 31.)  Plaintiff spent

the majority of his time at this assignment until December, 2006, when SEPTA implemented an

assignment system that required custodians to bid for jobs based on seniority.  (Compl. at 8; 4/12/07

Clark Dep. at 79-81.)  Under the new system, Plaintiff was no longer assigned to clean restrooms.

(4/12/07 Clark Dep. at 212-13.)

**Plaintiff Again Seeks To Be A Body Mechanic, But Does Not Submit To An Exam By
SEPTA's Medical Department**

Less than a month after agreeing to be reinstated as a Maintenance Custodian, Plaintiff asked

SEPTA to reinstate him as a Body Mechanic.  (Doc. No. 20 Ex. HH.)  On September 22, 2004,

Plaintiff submitted a Request for Work Modification form to SEPTA's Work Modification Advisory Committee. Plaintiff stated that he believed he was qualified for the position of Body Mechanic, and requested that SEPTA return him to that position despite the loss of his commercial driving license. (Doc. No. 20 Ex. HH, Ex. NN.)

The Work Modification Advisory Committee was comprised of individuals from SEPTA's medical, human resources, labor relations, operational, and legal departments. (Doc. No. 20 Ex. II.) The Committee met on October 20, 2004, to consider Plaintiff's request. (Id.) Also in attendance was Joseph Brennan, Director of Maintenance, who managed the work site where Plaintiff was assigned while he was a Body Mechanic. (Id.) Members of the Committee asked Mr. Brennan to detail a Body Mechanic's job duties. (4/23/07 Brennan Dep. at 27-28.) Mr. Brennan explained that Body Mechanics make repairs to the bodies of buses, replace glass, weld, use torches, paint buses, and work at unprotected heights. The Committee determined that because of his seizure disorder, Plaintiff was unable safely to perform the primary functions of a Body Mechanic. (Doc. No. 20 Ex. II, Ex. JJ.)

On October 13, 2004, Plaintiff's driver's license was restored, and in December, 2004, Plaintiff's commercial driving license was reinstated . (Doc. No. 20 Ex. KK.)

In January 2005, Plaintiff filed a grievance with the Union asking to be returned to the Body Mechanic position. (Doc. No. 20 Ex. LL.) In a May 10, 2005 letter denying the grievance, SEPTA informed the Union and Plaintiff that it was incumbent upon Plaintiff to contact SEPTA's Medical Department to be reevaluated if he believed that he was medically qualified for the Body Mechanic position based on a change of circumstances. (Doc. No. 20 Ex. MM.) The letter instructed Plaintiff to provide SEPTA's Medical Department with all pertinent medical documentation so that a

8

determination could be made based on the most current information.  (Id.)  Plaintiff never contacted SEPTA's Medical Department to be reevaluated.  (4/12/07 Clark Dept. at 165-68.)  The Collective Bargaining Agreement between SEPTA and the Union gives Plaintiff the right to request an examination by a third party physician if there is a dispute between his physician and SEPTA's Medical Authority.  (Doc. No. 51 Ex. 1.)   Plaintiff has never sought to take advantage of this provision because, to this day, he refuses to allow SEPTA's Medical Department to examine him.

### Plaintiff Commences Suit

In March, 2004, Plaintiff filed a discrimination charge against SEPTA with the EEOC.  (Compl. at 7-8.)  Plaintiff never informed his supervisor, Ms. Hill, of the complaint.  (4/12/07 Clark Dep. at 194-5.)

Plaintiff filed the instant Complaint on October 10, 2006, alleging that SEPTA discriminated against him because of his disability, failed reasonably to accommodate him, and retaliated against him for complaining about the alleged discrimination.  The matter was initially assigned to the late, Honorable Clifford Scott Green; on June 8, 2007, it was reassigned to me.  On July 3, 2007, Plaintiff filed a Motion for Partial Summary Judgment.  On July 5, 2007, Defendant filed a Motion for Summary Judgment.

### Plaintiff's Factual Misrepresentations

In their summary judgment papers, the Parties offered strikingly contradictory descriptions of certain material facts.  Accordingly, at oral argument, I asked a number of factual questions and directed the Parties to submit written responses – with specific record citations.   Plaintiff's submission is often evasive and, at points, dishonest.

For instance, both in his summary judgment papers and in his written response to my

9

questions, Plaintiff contends that the "safety sensitive" designation SEPTA applied to the Body Mechanic position did not exist before this litigation began. (Doc. No. 24 at 2-3; Doc. No. 50 at 3.). This is simply untrue. The March 20, 2001 Collective Bargaining Agreement between SEPTA and the TWU explicitly designated such positions as "safety sensitive." (Doc. No. 51 Ex. 1 at 4.)

I asked the Parties whether Body Mechanics used welding devices and torches powered by combustible gases. Plaintiff's written response to my question is a mass of evasion and obfuscation. Yet, the record is clear: Maintenance Director Brennan testified that Body Mechanics used such torches. Indeed, in his deposition, Plaintiff admitted that when he worked as a Body Mechanic, he used gas torches. (4/12/07 Clark Dep. at 131-33.) In response to SEPTA's Summary Judgment Motion, however, Plaintiff submitted a "clarifying" affidavit, explaining that he had previously used torches powered by combustible gas, but that he had more recently used electric torches. (Doc. No. 24 Ex. R ¶¶ 2-4.) Whether I look to Plaintiff's deposition, his affidavit, his summary judgment papers, or his response to my questions, however, Plaintiff nowhere offers evidence to contract the testimony of SEPTA's Maintenance Director that Body Mechanics use torches powered by combustible gases.

Similarly, I asked the Parties if the record showed whether SEPTA Body Mechanics work at unprotected heights. Once again, Maintenance Director Brennan testified in his deposition that because Body Mechanics must make some of their repairs while working atop busses and train cars, they work at unprotected heights. (Brennan Dep. at 28.) Plaintiff's written response to my question was, once again evasive, noting that he testified in his deposition that he had never welded at unprotected heights. (Doc. No. 50 ¶ 7.)

I asked the Parties whether the record confirmed that SEPTA would reinstate Plaintiff to the

Body Mechanic position if he passed a physical exam administered by SEPTA's Medical Department or a third party physician. Plaintiff denies that he received the May 10, 2005 letter to this effect addressed to the TWU President, rejecting the grievance filed by Plaintiff and the Union. (Doc. No. 51 Ex. 3.) Yet, the CBA under which Plaintiff has proceeded throughout his tenure at SEPTA explicitly provides this route to reinstatement. (Doc. No. 51 Ex. 1.) Moreover, Defendant's Counsel sent a letter to Plaintiff's Counsel on August 6, 2007, reminding him of this contractually required medical dispute resolution process. (Doc. No. 51 Ex. 2.)

In his summary judgment papers (and at oral argument), Plaintiff repeatedly contended that SEPTA has not reinstated him because of an impermissible prejudice against epileptics. (Doc. No. 24 at 8-9.) I asked the Parties to indicate what the record disclosed about the cause of Plaintiff's seizures. Because Plaintiff has not allowed SEPTA's Medical Department to examine him, it has been unable to come to its own conclusion respecting the cause. Rather, the only record evidence related to the cause of Plaintiff's seizures – the letter from Dr. Zlatnick, Plaintiff's neurologist – provided that Plaintiff's withdrawal from alcohol caused the seizures. (Doc. No. 51 Ex. 4.) In any event, Plaintiff and SEPTA responded to my question that nothing in the record indicates that Plaintiff suffers from epilepsy. (Doc. Nos. 50, 51.)

In sum, it is apparent that when confronted with unfavorable facts, Plaintiff has simply ignored them, falsely denied their existence, or misrepresented the opposite. None of the resulting factual disputes is genuine, however. On the contrary, these material facts are undisputed. See Blaylock, 504 F.3d at 413.

## III.   DISCUSSION

Plaintiff's Complaint is comprised of three Counts: disparate treatment disability

discrimination (Count One); failure to accommodate (Count Two); and retaliation (Count Three). Plaintiff bases each count on the same three statutes: the ADA, the Rehabilitation Act, and the PHRA.

The Rehabilitation Act incorporates the ADA's legal standards.  29 U.S.C. § 492(d); see Donahue v. Consol. Rail Corp., 224 F.3d 226 (3d Cir. 2000); Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997).  Because the provisions of the ADA and PHRA are substantially similar, the analytical framework is identical.  See Fogelman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).  Accordingly, I will discuss only the ADA claim.

### A.    Disparate Treatment and Failure to Accommodate

Plaintiff alleges that SEPTA violated the ADA by failing to reinstate him to the Body Mechanic position.  Under the ADA,

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The term "disability" means "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

The ADA prohibits an employer from

not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of business . . .

42 U.S.C. § 12112(5)(a).  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).

An undue hardship is "an action requiring significant difficulty or expense."  42 U.S.C. § 12111(10).

An employer is not required to provide an accommodation to an individual that poses a "direct threat" to the safety of the employee or others.  Turner v. Hershey Chocolate U.S., 440 F.3d 604, 614 (3d Cir. 2005).

To establish a *prima facie* case of disability discrimination within the meaning of the ADA, an employee must demonstrate that he or she

> (1) has a disability, (2) is otherwise qualified to perform the essential functions of the job, with or without accommodations by the employer, and (3) has suffered an adverse employment action because of his or her disability.

Barclay v. Amtrak, 2007 WL 2004382, at *2 (3d Cir. July 12, 2007).  "If the employee makes out a *prima facie* case of discrimination, the employer may prevail by demonstrating a legitimate, non-discriminatory reason for the adverse action."  Id.  If the employer offers a legitimate reason for its actions, the burden shifts back to the employee to demonstrate that the proffered reason is merely a pretext for discrimination.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  Under this framework, to defeat an employer's summary judgment motion, a plaintiff must point to some evidence from which the "factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions."  Id. at 764.

Resolving all factual disputes in favor of the Plaintiff (and disregarding Plaintiff's factual misrepresentations), I conclude that he has failed to make out the second prong of the *prima facie*

13

case.  Plaintiff was not qualified to perform the essential functions of the Body Mechanic position, because: (1) he was not qualified to perform the job; and (2) no reasonable accommodation would have made him qualified.

### 1.        Qualification Standards

An employer may apply "qualification standards" for a position as long as those standards are "job-related and consistent with business necessity."  42 U.S.C. § 12113(a).  SEPTA uses reasonable qualification standards based on safety considerations.  Plaintiff has failed to satisfy those standards.

**DOT Standards**

SEPTA adheres to DOT physical standards in determining whether an individual is qualified to operate a commercial vehicle.  DOT medical regulations state that a person with an "established medical history or clinical diagnosis of epilepsy or any other condition that is likely to cause loss of consciousness or any loss of ability to control a motor vehicle" is not physically qualified to drive a commercial motor vehicle.  49 C.F.R. § 391.41(b)(8).  DOT's interpretation of these regulations (found in the Medical Advisory Criteria) states that a driver who is taking anti-seizure medication or has not fully recovered from the known medical condition that caused a seizure is not qualified to operate a commercial motor vehicle.  Medical Advisory Criteria § 391.41(b)(8) at 411.

The Supreme Court and the Third Circuit have held that an employer may, consistent with the ADA, apply DOT's physical qualification standards to its employees.  See Albertson's, Inc. v. Kirkinburg, 527 U.S. 555, 573 (1999) ("When Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law."); Coleman v. Keystone Freight Corp., 142 Fed. Appx. 83, 87 (3d Cir. 2005) (ADA did not prohibit firing Plaintiff where he failed

to meet DOT regulations).  The Tenth Circuit has similarly held that employers may rely on the

DOT's Medical Advisory Criteria in establishing qualification standards:

> We have little difficulty concluding that Defendant may rely on a reasonable interpretation of DOT's Medical Advisory Criteria, which undoubtedly are job-related and consistent with Defendant's safety and liability concerns, to establish physical requirements for its CMV operators, provided Defendant does so consistently and uniformly.

Tate v. Farmland Indus., 268 F.3d 989, 994-95 (10th Cir. 2001).  These DOT standards are

particularly apposite in the instant case because they have been adopted by the Commonwealth in

setting standards for the operation of commercial vehicles.  See 67 Pa. Code § 229.1 (2007); 67 Pa.

Code § 231.1 (2007).

In accordance with the DOT regulations, SEPTA's Medical Department considered whether

Plaintiff was fit to operate a commercial vehicle.  Plaintiff had sustained five seizures in the four

years leading up to Dr. Gares's 2004 examination, and was taking anti-seizure medication.  Because

Plaintiff had not provided his medical records, Dr. Gares did not know the cause of these seizures.

Under the DOT regulations, however, regardless of the cause, Plaintiff was not qualified to operate

a commercial vehicle because he had a medical history of seizures, he could not show that he had

recovered from the condition causing the seizures, and he was taking anti-seizure medication.  The

Medical Department's determination that he was not qualified to drive commercial vehicles – and

the Workforce Advisory Committee's subsequent reliance on this determination in refusing to

reinstate him to the position of  Body Mechanic – were thus in accordance with DOT regulations.

In his summary judgment papers, Plaintiff casually dismisses that he is still on anti-seizure

medication, stating that he takes the medication as "insurance" against another seizure.  (Doc. No.

24 at 7.)  Under the Medical Advisory Criteria, however, such "insurance" renders him unqualified

to operate a commercial vehicle safely.  Moreover, because, in seeking his September 2004 Work Modification Request, Plaintiff chose not to submit to a full examination by SEPTA's Medical Department – or (as is his right under the CBA) an independent third party medical examination – SEPTA cannot make its own determination of the cause of his seizures or the likelihood of their recurrence.

It thus appears that the only evidence Plaintiff offers to show he is qualified to be a Body Mechanic is New Jersey's decision to reinstate his drivers licenses.  In these circumstances, no reasonable jury could find that Plaintiff has shown that he is qualified to work as a Body Mechanic. See Coleman, 142 Fed. Appx. at 85 (Plaintiff failed to show he could perform essential functions of job where he could not meet the DOT standards).

**Direct Threat**

An employee who is a direct threat to the safety of himself or others is not a qualified individual with a disability.  Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758, 764 (5th Cir. 1996).  Indeed, the ADA explicitly provides that permissible qualification standards "may include a requirement that an individual not pose a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b).  The Code of Federal Regulations define a direct threat as:

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job.  This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.  In determining whether an individual would pose a direct threat, the factors to be considered include:
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and

16

(4) The imminence of the potential harm.

29 C.F.R. § 1630.2.  The employer bears the burden of proving that an employee poses a direct threat.  <u>Rizzo</u>, 84 F.3d at 764.

The Workforce Modification Committee determined that Plaintiff was a direct threat because of his seizure condition.  Body Mechanics make repairs to the bodes of SEPTA's commercial vehicles.  This necessarily entails the use of heavy equipment, working at heights, and operating the commercial vehicles that are being repaired.  Were Plaintiff to have a seizure while using heavy equipment, the resulting harm could be quite significant.  Were he to have a seizure while working on the roof of a bus or train car, he could fall and severely injure himself or others nearby.  If Plaintiff had a seizure while driving a commercial vehicle, the harm could be catastrophic, as the DOT and SEPTA have recognized in formulating the physical standards for commercial drivers.

Because Plaintiff is a direct threat to himself and others, he is not qualified, as a matter of law, to perform the essential functions of the safety sensitive position of Body Mechanic.

### 2.        Reasonable Accommodation

Having determined that Plaintiff is not qualified to perform the essential functions of Body Mechanic, I must next determine whether he could have been qualified with a reasonable accommodation.  <u>See</u> <u>Deane v. Pocono Med. Cent.</u>, 142 F.3d 138, 146 (3d Cir. 1998). Plaintiff bears the burden of showing, as part of his *prima facie* case, that an accommodation that would make him qualified is possible.  <u>Shiring v. Runyon</u>, 90 F.3d 827, 832 (3d Cir. 1996).

Although Plaintiff has pled that SEPTA failed to make reasonable accommodations, he proposes no accommodation that would make him qualified to be a Body Mechanic.  (Compl. at 5-7.)  Thus, he fails to meet his burden of showing that an accommodation is even possible.  <u>Shiring</u>,

17

90 F.3d at 832 ("[I]t falls to the employee to make at least a facial showing that such accommodation is possible.").

In sum, Plaintiff has failed to satisfy the second prong Third Circuit's *prima facie* test. Barclay, 2007 WL 2004382.  Accordingly, SEPTA is entitled to summary judgment as to Plaintiff's claims of disparate discrimination (Count One of Plaintiff's Complaint) and failure to accommodate (Count Two).

**B.      Retaliation**

Plaintiff also claims that SEPTA retaliated against him because he filed a charge of discrimination with the EEOC.  Under the ADA,

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a); see also Williams v. Philadelphia Housing Auth. Police Dep't., 380 F.3d 751, 758-59 (3d Cir. 2004).

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) he engaged in ADA-protected activity; (2) an adverse action by his employer either after or contemporaneous with his protected activity; and (3) a causal connection between the protected activity and the adverse action.  Fogelman, 283 F.3d at 567-68.  If an employee establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the alleged retaliatory action.  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).  The employer's burden at this stage is

> relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason

actually motivated the [action].

Id. (quoting Woodson v. Scott Paper, 109 F.3d 913, 920 n.2 (3d Cir. 1997).  If the defendant satisfies this burden, the plaintiff must establish by a preponderance of the evidence that the allegedly legitimate reasons offered by the defendant were a pretext for retaliation.  Id.

In the instant case, Plaintiff alleges that he engaged in activity protected by filing a charge with the EEOC in March 2004 and by "rais[ing] a number of concerns both directly and through others that he felt he was being discriminated against."  (Compl. at 8.)  The alleged adverse employment actions include: (1) that Defendant has required Plaintiff to clean toilets and perform menial tasks more often than those Custodians with less seniority; and (2) that Defendant "more vigorously refused to place [Plaintiff] in the position of vehicle and equipment Body Mechanic - first class even though there have been numerous openings."  (Compl. at ¶ 8.)

Considering the evidence presented in the light most favorable to Plaintiff, I do not believe he has established a *prima facie* case.  SEPTA does not dispute that Plaintiff engaged in ADA protected activity.  (Doc. No. 20 at 19-20.) Plaintiff simply produced no evidence, however, to establish a causal link between that protected activity and his custodial assignments.  To establish a causal link, "the plaintiff must present evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action.  Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."  Zechman v. Christiana Care Health Systems, 2007 WL 1891123, at *6 (D. Del. June 26, 2007) (quoting Ferguson v. E.I. DuPont de Nemours & Co., 560 F. Supp. 1172, 1200 (D. Del. 1983)).  It is undisputed that Helen Hill alone determined the custodial assignment that Plaintiff claims was retaliatory.  (Hill Dep. at 23.)  Plaintiff has not shown that Ms. Hill even knew of Plaintiff's charge of discrimination.

19

Moreover, Ms. Hill is not a SEPTA employee. (Hill Dep. at 8.)   Rather, she works for ABM Janitorial Service.   (Id.)   Thus, even if Plaintiff had shown that Ms. Hill knew of Plaintiff's discrimination charge, Plaintiff has not produced any evidence that Ms. Hill acted with a retaliatory motive.

Plaintiff also alleges that SEPTA's retaliation was manifested in the vigor with which it opposed his reinstatement as a Body Mechanic.  Plaintiff has offered no evidence, however, showing that SEPTA's "opposition" to his reinstatement was any more vigorous than its "opposition" to the reinstatement of any other SEPTA employee who had not charged SEPTA with discrimination.  In these circumstances, Plaintiff cannot as a matter of law establish a *prima facie* case as to this part of his retaliation claim.

Even if Plaintiff could establish a *prima facie* case, however, SEPTA has provided legitimate, non-discriminatory reasons for its actions.  As to Plaintiff's first contention, SEPTA has met its burden by showing that Plaintiff was assigned in accordance with a system that placed employees based on openings, rather than seniority.  After the system was changed in 2006 to allow employees to choose assignments based on seniority, Plaintiff chose a new job – he is no longer assigned to clean restrooms.  (4/12/07 Clark Dep. at 212-13.) Thus, SEPTA has met its burden, and adequately refuted Plaintiff's contention that he received less desirable assignments than those employees with less seniority as a form of retaliation.

As to Plaintiff's second contention, SEPTA has met its burden by demonstrating that Plaintiff's request to be reinstated to the position of Body Mechanic was refused because he failed to meet the qualification standards – a perfectly legitimate reason.

Plaintiff has provided no evidence that SEPTA's reasons are pretextual.  Accordingly,

SEPTA is entitled to summary judgment as to the retaliation claim (Count Three).

**IV.      CONCLUSION**

The undisputed material facts show that Plaintiff has not made out any of his claims under the ADA.  Because his Retaliation Act and PHRA claims are legally identical, these, too, must fail as a matter of law.  See Donahue v. Consol. Rail Corp., 224 F.3d 226 (3d Cir. 2000); Fogelman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002).  I will thus grant SEPTA's Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment.  An appropriate Order follows.


BY THE COURT.

*/s Paul S. Diamond*
_____
Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CLAUDE J. CLARK** | : | |
| | : | |
| v. | : | **Civ. No. 06-4497** |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY** | : | |

---

**O R D E R**

AND NOW, this 24th  day of January, 2008, it is ORDERED that:

(1)     Plaintiff's Motion for Partial Summary Judgment (Doc. No. 19) is **DENIED**;

(2)     Defendant's Motion for Summary Judgment (Doc. No. 20) is **GRANTED**;

(3)     **JUDGMENT IS ENTERED** in favor of Defendant and against Plaintiff;

(4)     All trial related motions (Docs. No. 39, 40, 41) are denied as moot;

(5)     The Clerk's Office shall close this case for statistical purposes.


IT IS SO ORDERED.

*/s Paul S. Diamond*

_____

Paul S. Diamond, J.